**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **DEBBIE L. HURSH,** ) | |
| ) | |
| **Plaintiff** ) | |
| **vs.** ) | **Case No. 11-CV-658-TLW** |
| ) | |
| **MICHAEL J. ASTRUE, Commissioner,** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

**OPINION AND ORDER**

Plaintiff Debbie L. Hursh seeks judicial review of the decision of the Commissioner of the Social Security Administration denying her claim for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 416(i), 423, and 1382c(a)(3). In accordance with 28 U.S.C. § 636(c)(1) & (3), the parties have consented to proceed before a United States Magistrate Judge. (Dkt. # 10). Any appeal of this decision will be directly to the Tenth Circuit Court of Appeals.

**INTRODUCTION**

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of the impairment during the time of the alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a).

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. § 405(g) is limited to a determination of whether the record as a whole contains substantial evidence to support the decision and whether the correct legal standards were applied. See Briggs ex. rel. Briggs v. Massanari, 248 F.3d 1235, 1237 (10th Cir. 2001); Winfrey v. Chater, 92 F.3d 1017, 1019 (10th Cir. 1996); Castellano v. Secretary of Health & Human Serv., 26 F.3d 1027, 1028 (10th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." O'Dell v. Shalala, 44 F.3d 855, 858 (10th Cir. 1994). The Court is to consider whether the Administrative Law Judge ("ALJ") followed the "specific rules of law that must be followed in weighing particular types of evidence in disability cases," but the Court will not reweigh the evidence or substitute its judgment for that of the ALJ. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007).

## BACKGROUND

Plaintiff claims disability from an alleged onset date of November 1, 2006. (R. 390). Plaintiff's medical history includes breast cancer (2006), resulting in a lumpectomy and lymphectomy, anxiety, depression, ruptured/bulging discs in back, and chronic pain. (R. 372, 504).

A consultative examination was completed by Linda Craig, Psy.D., on September 25, 2007. The report notes that plaintiff was depressed and anxious, but non-suicidal. (R. 371). Dr. Craig's report first states that plaintiff had experienced occasional hallucinations for the past five years, but later states that plaintiff had experienced hallucinations for the past fifteen years. Id. Dr. Craig described plaintiff's cognitive abilities as normal with a normal ability to focus and concentrate, a fair fund of information, a compromised immediate memory, an intact short-term memory, an inability to spell "world" backwards, and poor judgment. Id. Plaintiff's chief complaint was chronic pain from degenerative joint disease in her neck and back. Id. Plaintiff worked from 1971 to 1994 for American Airlines as an International Tariff Officer until she was fired and went to prison in 1995. (R. 372). Plaintiff reported that she had worked for two months after her release from prison, but that she had not been working thereafter because she was "mentally unable to handle it." Id. Plaintiff's activities of daily living include housecleaning, cooking, taking care of her son, and transporting him to and from school. Id. Though plaintiff reported taking her son to and from school each day, plaintiff also stated that she only gets out of the house approximately once every two weeks. Id. Dr. Craig did not note any under-reporting or over-reporting of plaintiff's symptoms. Id.

The next reports in the record are a Psychiatric Review Technique Form ("PRT") and a Mental Residual Functional Capacity Assessment ("mental RFC"), completed by Lynette Causey, Ph.D., on January 8, 2008. (R. 376). Dr. Causey reviewed the medical records and opined that plaintiff has a cognitive disorder, not otherwise specified ("NOS"); major depressive disorder that is recurrent and severe; posttraumatic stress disorder, ruled out; a personality disorder, NOS with borderline traits; moderate limitation pertaining to difficulties in maintaining concentration, persistence, or pace; and a mild limitation pertaining to difficulties in maintaining

social functioning. (R. 376-383). The report notes that plaintiff's thought processes were intact and that her speech, cognitive abilities, and ability to focus and concentrate appeared to be normal. (R. 388). Plaintiff's immediate memory was compromised, her short-term memory was intact, her insight was fair, her judgment was poor, and she was functioning in the low-average range. Id. The report recounts the prior findings that plaintiff was anxious and depressed, had been hearing voices for the past five years, and that her activities of daily living included driving, paying bills, using a checkbook, shopping, and spending time with others. Id. Dr. Causey assigned plaintiff a mental RFC that included marked limitations in plaintiff's ability to understand and remember detailed instructions, her ability to carry out detailed instructions, and her ability to interact appropriately with the general public. (R. 390).

A consultative examination was performed by Joel Hopper, D.O., on May 12, 2008. Plaintiff's chief complaints were hip and leg pain dating back to her chemotherapy for breast cancer. (R. 504, 510). She also claimed that she experienced chest discomfort for an unknown reason one time per month during the past six months, with a 10 out of 10 pain intensity level. Id. Plaintiff stated that she had been unable to attend school since her treatment began and that she was "too sick to work." Id. She reported that she had been seeing an oncologist, Jennifer Trottman, M.D., and a pain management physician, Dr. Andrew Revelis, M.D. Id. Dr. Hopper found that plaintiff had normal thought processes, a normal range of joint motion, and normal lumbosacral and cervical spine extension, flexion, and rotation. (R. 506).

A Mental Status Examination was performed on May 16, 2008, by Michael D. Morgan, Psy.D. (R. 512). During the examination, plaintiff claimed that she was unable to work due to breast cancer, anxiety, depression, and ruptured/bulging discs in her back and that she had experienced depression dating back to age sixteen. (R. 513). Plaintiff stated that these problems

began to interfere with her ability to work in 2006, that she last worked in 2005, and that she had stopped working because her job had ended and she wanted to go back to college. (R. 512). Plaintiff reported seeing a psychiatrist and a counselor, and she reported that the prescribed medication she had been taking was "somewhat effective" for her depression and anxiety. Id. She was also taking 90 mg of morphine every day for chronic pain. Id.

Dr. Morgan further noted that plaintiff had regular contact with family and others in and outside her home environment. Id. Plaintiff's regular activities of daily living included watching TV, housework, spending time with her boyfriend, and caring for her son. (R. 513). She was capable of taking care of her personal grooming needs, but she reported that she was unable to perform some household chores. Id. She stated that she required more time to rest than before and that she was unable to engage in strenuous activity. Id. Plaintiff had problems sleeping due to chronic pain, and she often experienced fatigue, but she denied taking naps. Id. Plaintiff's education consists of 90 completed credit hours of college coursework. (R. 514). The Mental Status portion of the report indicates that plaintiff had normal memory and concentration, normal verbal functioning, normal thought processes, normal insight, and a low-average level of intelligence. (R. 513).

A Physical RFC Assessment was completed on May 27, 2008 by Thurma Fiegel, M.D., (R. 517). Dr. Fiegel reviewed plaintiff's file and opined that plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, and could push and/or pull without limit. (R. 518). The RFC references Dr. Revelis' November 28, 2007, exam report which states that plaintiff had 5/5 bilateral upper/lower extremity strength, full range motion of spine, 10/10 pain, and hormone therapy following her lumpectomy for right breast cancer. Id. The RFC also references Dr. Hopper's

5

report from May 12, 2008, which documents plaintiff's chronic pain in hips and lower extremities. Id. The RFC notes that plaintiff had received steroid injections for pain in the lumbar and cervical areas, had infarct of basal ganglia area, and had no neurological deficit. Id. Dr. Fiegel concluded that plaintiff had full motion and no nerve root compression. (R. 519).

Another consultative examination was completed on July 23, 2009 by Minor Gordon, Ph.D. (R. 613). Plaintiff's reported complaints were breast cancer resulting in a lumpectomy, lymphectomy, and radiation; gall bladder surgery; hepatitis C (for which she would be undergoing treatment); depression; and persisting fatigue with less strength than before. Id. Plaintiff reported being treated by two different therapists over the past two years. Id. She said she had completed 60 credit hours in school. Id. The last time she had worked was in May 2006, which ended due to health problems. Id. Plaintiff's reported activities of daily living were cooking, cleaning, keeping the yard mowed, and caring for her eight year-old son. Id. Dr. Gordon's examination report references the consultative examination completed by Dr. Craig on September 25, 2007. (R. 371-373). Dr. Gordon accurately references Dr. Craig's evaluation, noting that plaintiff's symptoms were consistent with major depression and that her ability to work was moderately impaired with respect to understanding complex instructions, remembering instructions, sustaining focus and concentration, and socially interacting with coworkers and/or the public. (R. 614).

Dr. Gordon opined that plaintiff had the ability to perform simple, routine work with no public contact. Id. Dr. Gordon also referenced Dr. Causey's PRT dated January 8, 2008, noting plaintiff's marked limitation in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, and her ability to interact appropriately with the general public. (R. 614, 376-388). Dr. Gordon concluded that plaintiff has a low-average intelligence

level, that she would have difficulty passing judgment in a work situation depending on complexity, and that she would likely have some difficulty communicating comfortably with the general public. (R. 615). Plaintiff's immediate retention and recall was assessed as adequate, but her visual immediate memory, immediate memory, and visual delayed memory fell in the range of mild impairment. (R. 616). The Beck Depression Inventory indicated that plaintiff suffered from an extremely severe level of depression. Id. Dr. Gordon stated that his impression of plaintiff's reported feelings of depression, anxiety, and worthlessness *did not* seem to be sincere. Id.

Dr. Gordon noted that plaintiff had breast cancer resulting in radiation treatment, then gallbladder surgery followed by hepatitis C. (R. 617). Plaintiff's activities of daily living were normal in that she was able to care for her son and maintain her home. Id. Dr. Gordon concluded that plaintiff had moderate depression secondary to unmet dependency needs, that she was functioning with a full scale IQ of 76, that she could be expected to perform some type of routine and repetitive task on a regular basis, and that she may have difficulty communicating with the general public, but that she could communicate adequately with coworkers and supervisors on a superficial level for work purposes. Id.

The Medical Source Statement by Dr. Gordon stated that plaintiff had marked limitations in her ability to understand and remember complex instructions, her ability to carry out complex instructions, and her ability to make judgments in complex work-related activities. (R. 619). She was moderately impaired in her ability to interact appropriately with the public, but no limitation was recorded in her ability to interact appropriately with supervisors or co-workers. Id.

Dr. Beau Jennings, D.O., completed plaintiff's final consultative examination on September 8, 2009. (R. 621). His report is consistent with the prior examinations noting

plaintiff's complaint of pain in her neck and lower body extending to her calves. Id. The report also documents plaintiff's history of hepatitis C, breast cancer, and transient ischemic attacks. Id. No abnormalities are noted in the physical examination portion of the assessment. Id.

Subsequent to the ALJ's decision, plaintiff submitted additional records to the Appeals Council from plaintiff's treating physician, Scott Hanan, M.D. This new evidence includes clinical progress notes, a letter, and a mental RFC. (R. 1068-1096).

Dr. Hanan had been treating plaintiff since June 26, 2008, for a mood disorder, NOS. Dr. Hanan's clinical progress notes prior to the ALJ's decision on April 23, 2010, document plaintiff's treatment for depression and anxiety. (R. 1078-1090). These notes do not reflect different material from that which is documented in the other medical reports. In fact, these notes state that plaintiff's symptoms were "under satisfactory control." (R. 1170). Nonetheless, Dr. Hanan's letter concludes that plaintiff is disabled and unable to work due to her chronic depression and medical problems. (R. 1092).

Dr. Hanan's mental RFC shows more severe limitations than those found in the prior mental RFC by Dr. Causey. Dr. Causey's mental RFC shows marked limitations in plaintiff's ability to understand and remember detailed instructions, her ability to carry out detailed instructions, and her ability to interact appropriately with the general public. (R. 390). Dr. Hanan's RFC notes marked limitations in plaintiff's ability to understand and remember detailed instructions, her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods, her ability to perform activities within a schedule, to maintain regular attendance, and to be punctual with customary tolerances, her ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms, and her ability to perform at a consistent pace without an unreasonable number and

length of rest periods. (R. 1095). Dr. Hanan's RFC does not document significant limitations in plaintiff's ability to socially interact. (R. 1096).

The Notice of Appeals Council Action states that the Council considered the later submitted evidence, but found that it did not provide a basis for changing the ALJ's decision. (R. 1). The Appeals Council reviewed and affirmed the ALJ's decision on September 22, 2011. <u>Id.</u>

## DECISION ISSUED BY ALJ

The ALJ found that plaintiff met the insured status requirements through September 30, 2011. (R. 22).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of November 1, 2006. <u>Id.</u> At step two, the ALJ determined that plaintiff's severe impairments were hepatitis C, a history of breast cancer, depression, anxiety, degenerative disc disease, and mini strokes. <u>Id.</u> At step three, the ALJ decided that plaintiff's impairment or combination of impairments did not meet, nor were medically equivalent, to one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 27). After his examination of the medical records, the ALJ found that plaintiff had a RFC to perform light work, as defined in 20 CFR 404.1567(b), with the additional limitations of only occasionally stooping and occasionally climbing ladders, ropes, and scaffolds. (R. 28). In regard to mental status, the ALJ found marked limitation in plaintiff's ability to understand, remember and carry out complex instructions; marked limitation in her ability to make judgments in complex work-related decisions; and moderate limitation in her ability to interact appropriately with the general public. <u>Id.</u> Based on the RFC findings, the ALJ concluded at step four that plaintiff was unable to perform her past relevant work. (R. 33). At step five, the ALJ determined that there existed a

significant number of jobs in the national economy which plaintiff could perform based on her age, education, work experience, and RFC. (R. 33).

## ISSUES

Plaintiff argues that the ALJ's decision should be reversed for the following three reasons:

1. The ALJ failed to properly consider the opinion evidence;

2. The ALJ failed, at step five of the sequential evaluation process, to include all of plaintiff's documented limitations in the hypothetical to the vocational expert ("VE") or in his decisional RFC; and

3. The ALJ failed to perform a proper credibility determination.

(Dkt. # 17 at 2).

## DISCUSSION

### The Opinion Evidence

Plaintiff first argues that the ALJ failed to properly consider the opinion evidence because he made his decision based on reviewers' reports that were inconsistent, inaccurate, and based on incomplete evidence. Plaintiff also alleges that the ALJ did not adequately consider other source information, that he did not properly explain the weights he afforded to the records, and that significant evidence from plaintiff's treating physician was missing from the record when the ALJ made his decision. (Dkt. # 17 at 2-6).

The Court does not reach the same conclusion as plaintiff with respect to the reviewers' reports. Specifically, plaintiff complains that her impairment in relating to coworkers was ignored by the reviewers. (Dkt. # 17 at 3). Pursuant to the ALJ's request, Dr. Gordon reviewed the previous records and also completed his own consultative examination. (R. 26). Dr. Gordon's

report specifically and accurately refers to both Dr. Craig's findings and Dr. Causey's findings. (R. 614). Dr. Craig's conclusion is somewhat ambiguous, finding that plaintiff's ability to work was "moderately impaired with respect to understanding complex instructions, remembering instructions, sustaining focus and concentration, *or* socially interacting with coworkers or public." (R. 373) (emphasis added). Dr. Gordon notes that plaintiff's symptoms were consistent with major depression and that her ability to work was moderately impaired with respect to understanding complex instructions, remembering instructions, sustaining focus and concentration and socially interacting with coworkers and/or the public. (R. 614). Dr. Gordon also refers to Dr. Causey's PRT noting plaintiff's marked limitation in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, and her ability to interact appropriately with the general public. (R. 614, 376-388). Based on these prior reports and his own examination, Dr. Gordon concluded that plaintiff "retained the ability to perform some type of routine and repetitive task on a regular basis," and that though "she may have difficulty communicating with the general public, she certainly would be able to communicate adequately with coworkers and supervisors on a superficial level for work purposes." (R. 617).

Plaintiff also asserts that Dr. Revelis' November 28, 2007, pain management report was inadequately documented in the RFC. (Dkt. # 17 at 3). More specifically, plaintiff complains that the ALJ failed to mention the diagnostic studies showing degenerative disc disease for which plaintiff underwent ESI for lumbar degenerative disc disease, lumbar sciatica, and lower extremity radiculopathy. (R. 438). Contrary to plaintiff's assertion, the ALJ's RFC adequately references most of these findings, noting that plaintiff's pain was 10 out of 10, that she had no abnormalities in motion, and that she had received steroid injections for pain in lumbar and cervical areas. (R. 518).

11

Next, plaintiff argues that the ALJ did not properly consider other source information. In particular, plaintiff asserts that the ALJ did not properly consider the initial disability report of June 14, 2007, which is a phone interview that demonstrates plaintiff's discomfort. The report states that plaintiff sounded like she was in constant pain, that her voice/answers were strained, and that she gasped and caught her breath constantly throughout the interview. (R 191). There is also a function report solicited by the agency from a third party that plaintiff argues was not properly considered by the ALJ. (Dkt. # 17 at 5). The report addresses plaintiff's overall health and her ability to function, and is also favorable to plaintiff's credibility. (R. 191, 233-240).

The Tenth Circuit recently held that a claimant's anecdotal evidence from nonmedical professionals is not significantly probative and that an ALJ does not err by discounting it without explanation. See Frantz v. Astrue, 509 F.3d 1299, 1301 (10th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)). The function report was completed by plaintiff's friend, and the ALJ confirmed that he had considered all the evidence in the file. (R. 21). Additionally, though the ALJ did not specifically mention plaintiff's alleged pain and difficulty concentrating at the disability interview, he did adequately consider plaintiff's condition, which he noted several times in his decision. (R. 23-31). The ALJ considered plaintiff's reports of pain, as reflected in the records of Dr. Craig, the Oklahoma Tulsa Family Medicine Clinic, Dr. Revelis, Dr. Hopper, Dr. Morgan, Dr. Conkling, Dr. Jennings, and in plaintiff's testimony. Id. He also recognized plaintiff's difficulty concentrating which had been noted by Dr. Hanan, by Dr. Gordon, and in plaintiff's testimony. Id.

Plaintiff next argues that the ALJ did not properly explain how he determined the weight he assigned to the medical records. (Dkt. # 17 at 5). Plaintiff claims that the ALJ did not adequately explain his underlying analysis for these determinations, stating only that they "were

consistent with the physical and mental documents in file," and that he did not explain why he considered Dr. Gordon's rather than Dr. Craig's consultative examination. Id.

Unless a treating source's opinion is given controlling weight, the ALJ must explain in the decision the "weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, non-treating sources, and other non-examining sources who do not work for us." 20 C.F.R. § 404.1527 (e)(2)(ii).

In his decision, the ALJ states the weight he assigned to the medical evidence, and he also explains his reasoning underlying the weight he assigned. (R. 32). The ALJ's decision first provides an accurate summary of the medical records. (R. 22-31). The ALJ thoroughly discusses plaintiff's medical history according to the findings from Tulsa Urban Indian Healthcare Center ("IHS"), Dr. Craig, the University of Oklahoma Tulsa Family Medicine Center, Dr. Revelis, Hillcrest Medical Center, Dr. Hopper, Dr. Morgan, Dr. Hanan, Dr. Conkling, Dr. Gordon, and Dr. Jennings. Id.

The ALJ then explains his rationale for the weights that he assigned. The ALJ afforded substantial weight to the IHS records because the records date back to 2004 and follow plaintiff's progress through her impairments. He afforded considerable weight to the reviewer's reports, because they are consistent with the physical and mental documents on file. He afforded significant weight to the consultative examination report given the fact that the examiners reviewed both the previous records, as well as plaintiff herself, and further, because the findings correlated with the evidence on file. The ALJ afforded some weight to the hospital records, the cancer treatment records, and the mental health records, because much of the information

contained in those records came from plaintiff rather than from actual documented medical evidence. (R. 32).

Finally, the ALJ afforded the most weight to Dr. Gordon's report. (R. 26). The rationale underlying the ALJ's duty to develop the record is to "fully and fairly develop the record as to material issues." Hawkins v. Chater, 113 F.3d 1162, 1168 (10th Cir. 1997). The ALJ specifically requested the consultative examination performed by Dr. Gordon in order to more fully develop the evidence in the medical record, such that the limitations of plaintiff could be fairly and objectively assessed in light of the variety of complaints that had been presented. (R. 26). As discussed above, the consultative examination by Dr. Gordon accurately cites the prior records, and it is evident that Dr. Gordon took into consideration all the available information when he completed his report.

Contrary to plaintiff's claim, the decision does not suggest that the ALJ used Dr. Gordon's consultative examination over Dr. Craig's consultative examination. (Dkt. # 17 at 5). Rather, the ALJ specifically notes that the findings from Dr. Craig, Dr. Causey, and Dr. Fiegel were supported by Dr. Gordon's findings, and that these findings were consistent with plaintiff's final consultative examination by Dr. Jennings. (R. 371, 390, 517, 613, 621). Dr. Gordon accurately referenced Dr. Craig's evaluation, noting that plaintiff's symptoms were consistent with major depression and that her ability to work was moderately impaired with respect to understanding complex instructions, remembering instructions, sustaining focus and concentration and socially interacting with coworkers and/or the public. (R. 614). Dr. Gordon also referenced Dr. Causey's PRT, noting plaintiff's marked limitation in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions, and her ability to interact appropriately with the general public. (R. 614, 376-388). Dr. Hopper noted

14

plaintiff's complaint of pain in her back and legs, as well as plaintiff's history of hepatitis C, breast cancer, and transient ischemic attacks, which is consistent with the prior medical findings. (R. 621). The ALJ then found that Dr. Hopper's findings were consistent with Dr. Revelis' finding that plaintiff had a full range of motion, negative straight leg raising exam bilaterally, normal bilateral toe and heel walking, a stable gait, normal grip strength and normal fine manipulation. (R. 434, 504).

Finally, plaintiff argues that the ALJ did not consider the mental RFC completed by plaintiff's treating physician, Dr. Hanan. (Dkt. # 17 at 4). Though the information was not submitted until after the ALJ's decision, plaintiff argues that it should be considered because it is relevant and the Appeals Council did not reject it. Id. This evidence refers to treatment dating back to 2008, and it was properly submitted prior to plaintiff's date last insured on September 30, 2011. Id. The report documents more severe impairments than those recognized by the non-treating state agency reviewers dated January 8, 2008. (R. 1091-1095, 390).

New evidence submitted to the Appeals Council becomes part of the administrative record that the Court must consider. O'Dell v. Shalala, 44 F.3d 855, 859 (10th Cir. 1994). Pursuant to 20 C.F.R. §§ 404.970(b) and 404.976(b)(1), the Appeals Council must consider evidence submitted with a request for review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Box v. Shalala, 52 F.3d 168, 171 (8th Cir. 1995); Wilkins v. Secretary, Dep't of Health and Human Servs., 953 F.2d 93, 95-96 (4th Cir. 1991). Because the ALJ did not have the new evidence before him when he rendered his decision denying benefits, the Commissioner's "'final decision' necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence." O'Dell, 44 F.3d at 859 (10th Cir. 1994). In other words, the Court is required "to

determine whether the qualifying new evidence upsets [the ALJ's] decision." Martinez v. Astrue, 389 Fed.Appx. 866, 869 (10th Cir. 2010) (unpublished). The Court is not automatically required to remand the case for the ALJ to reconcile any conflicts between the ALJ's findings and the new evidence.

The new evidence includes clinical progress notes, a letter, and a mental RFC. (R. 1068-1096). The clinical progress notes do not reflect material that is different than that which is noted in the prior records. (R. 1068-1090). Moreover, the notes state that plaintiff's symptoms were "under satisfactory control." (R. 1170). Dr. Hanan's letter nonetheless concludes that plaintiff is disabled and unable to work due to her chronic depression and medical problems. (R. 1092). However, a statement by a medical source, even a treating physician, that a claimant is "disabled" or "unable to work" does not mean that that the ALJ must determine that plaintiff is disabled. 20 C.F.R. § 404.1527 (e)(1). Such an opinion is reserved to the Commissioner, and it is the Commissioner who is responsible for making the determination about whether plaintiff meets the statutory definition of disability. Id.

Dr. Hanan's mental RFC does, however, include more severe limitations than those found in the prior mental RFC by Dr. Causey. (R. 1091-1096). Dr. Causey's mental RFC includes marked limitations in plaintiff's ability to understand and remember detailed instructions, her ability to carry out detailed instructions, and her ability to interact appropriately with the general public. (R. 390). Dr. Hanan's RFC includes marked limitations in plaintiff's ability to understand and remember detailed instructions, her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods, her ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances, and her ability to complete a normal work-day and workweek without

interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 1095). Dr. Hanan's RFC does not document significant limitations in plaintiff's ability to socially interact. (R. 1096).

The question is whether or not consideration of Dr. Hanan's additional limitations would have changed the ALJ's decision. Brock v. Chater, 84 F.3d 726, 729 (5th Cir. 1996) (explaining error is harmless if it would not have changed the outcome). See also Martinez v. Astrue, 389 Fed.Appx. at 869. Dr. Hanan's findings that plaintiff had marked limitations in her ability to concentrate, to maintain a schedule, to complete a normal workweek, and to perform at a consistent pace were not part of the ALJ's analysis. The Court has considered those additional limitations and finds that they should be rejected under the treating physician's analysis.

Ordinarily, a treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); see also Hackett v. Barnhart, 395 F.3d at 1173-74 (citing Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003)). If the ALJ discounts or rejects a treating physician opinion, he is required to explain his reasoning for so doing. See Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987) (stating that an ALJ must give specific, legitimate reasons for disregarding a treating physician's opinion); Thomas v. Barnhart, 147 Fed.Appx 755, 760 (10th Cir. 2005) (holding that an ALJ must give "adequate reasons" for rejecting an examining physician's opinion and adopting a non-examining physician's opinion).

In determining whether the opinion should be given controlling authority, the analysis is sequential. First, the ALJ must determine whether the opinion qualifies for "controlling weight," by determining whether it is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and whether it is consistent with the other substantial evidence in the administrative record. Watkins, 350 F.3d at 1300. If the answer is "no" to the first part of the inquiry, then the analysis is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. Id. "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

However, even if the ALJ finds the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the record, treating physician opinions are still entitled to deference and must be evaluated in reference to the factors enumerated in 20 C.F.R. § 404.1527. Those factors are as follows:

> (1) the length of the treating relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Id. at 1301 (citing Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001)). The ALJ must give good reasons in his decision for the weight he ultimately assigns the opinion. Id. (citing 20 C.F.R. § 404.1527(d)(2)). If the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so. Id. (citing Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1990)). The reasons must be of sufficient specificity to make clear to any subsequent reviewers the weight the adjudicator gave to the treating physician's opinion and the reasons for that weight. Anderson v. Astrue, 319 Fed. Appx. 712, 717 (10th Cir. 2009) (unpublished).

In this case, because the ALJ did not have these records at the time of his decision, the Court must perform the analysis. As an initial matter, Dr. Hanan's ultimate conclusion that plaintiff is unable to work cannot be given any special consideration. If a treating physician's opinion addresses an issue ordinarily reserved to the Commissioner, such as a claimant's ability to work or the ultimate question of disability, the ALJ may not give controlling weight to that opinion. See Butler v. Astrue, 410 Fed.Appx. 137, 142 (10th Cir. 2011) (citing 20 C.F.R. §§ 404.1527(e)) (unpublished). While a treating physician's opinion is ordinarily entitled to controlling weight, "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p. The ALJ may not ignore those opinions but "must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record," using the factors set forth in 20 C.F.R. § 404.1527(d), cited supra.

Turning to Dr. Hanan's treatment notes, the medical records demonstrate that Dr. Hanan was plaintiff's treating physician with respect to her mental impairments and had treated her regularly between June 2008 and July 2011, when Dr. Hanan issued the letter and completed the Mental Residual Functional Capacity Assessment. (R. 1068-96). However, the additional limitations cited in his opinion are inconsistent with his treatment notes and with the record as a whole. Although plaintiff was depressed, both she and Dr. Hanan reported that her symptoms were controlled through medication. (R. 1068-90). Dr. Hanan made only minor adjustments to plaintiff's medication once she became stabilized. Id. While plaintiff began to complain about the impact her physical impairments were having on her life in early 2011, Dr. Hanan did not make any significant adjustments to plaintiff's medication or increase the frequency of her appointments. (R. 1068-1073). In fact, in 2011, plaintiff was only seeing Dr. Hanan every three

months, rather than every six to eight weeks, as she had in 2008-2010. (R. 1068-73, 1074-90).

Dr. Hanan's additional limitations are also inconsistent with the findings of Drs. Craig, Gordon,

and Morgan. (R. 371-75, 512-16, 613-20).

For these reasons, the Court finds that Dr. Hanan's opinions would not have upset the

ALJ's decision; therefore, the Appeals Council did not err in denying review.

**Step 5 of Sequential Evaluation Process**

Plaintiff argues that the ALJ failed at step five of the evaluation process by failing to

include all of the documented limitations in the hypothetical to the VE, or in his decisional RFC

because he failed to include any limitation relating to plaintiff's ability to socialize in the

workplace with her coworkers or peers. (Dkt. # 17 at 6). Plaintiff asserts that the ALJ wrongly

omitted Dr. Craig's limitation regarding her ability to interact with coworkers, and that the ALJ

failed to include the PRT findings in his hypothetical to the VE, specifically regarding her

moderate limitations in concentration, persistence, or pace. Id.

The PRT documents moderate impairment with respect to plaintiff's ability to socially

interact with co-workers and/or the public but concludes that plaintiff had the ability to perform

simple, routine work with no public contact. (R. 388, 391). The transcript notes that the ALJ

directed the VE's attention to Exhibit 13F (the physical RFC by Dr. Fiegel), Exhibit 17F (the

consultative examination by Dr. Gordon), and Exhibit 18F (the consultative examination by Dr.

Jennings). (R. 79-81). The consultative examination by Dr. Gordon includes plaintiff's

impairment in socially interacting with co-workers and/or the public, as well as her moderate

limitations in concentration, persistence, or pace. (R. 613-620). On this basis, there is substantial

evidence indicating that the ALJ properly included all of plaintiff's documented limitations in

the hypothetical to the VE and also in his decisional RFC.

**The ALJ's Credibility Determination**

Plaintiff challenges the ALJ's credibility finding on the basis that there is insufficient supporting evidence. (Dkt. # 17 at 7). Specifically, plaintiff argues that the ALJ failed to demonstrate how or why plaintiff's activities of daily living were inconsistent with the medical evidence, that the ALJ erred in his interpretation of Dr. Craig's consultative examination, that the ALJ incorrectly discounted plaintiff's credibility due to internal discrepancies in the reports, that the ALJ erroneously miscast the evidence, that the ALJ failed to adequately discuss plaintiff's condition, that the ALJ erred by misquoting plaintiff, and that the ALJ improperly ignored factors that should have been deemed favorable to plaintiff's credibility. (Dkt. # 17 at 7-15).

The ALJ's credibility findings are afforded particular deference, because an ALJ is in a unique position to observe and gauge plaintiff's physical abilities and demeanor in a direct and unmediated fashion. White v. Barnhart, 287 F.3d 903, 909 (10th Cir. 2002). Although the ALJ should not ignore subjective complaints, he is not obligated to believe them. See Williams v. Bowen, 844 F.2d 748, 754-55 (10th Cir. 1988). As long as the ALJ sets forth the specific evidence he relies on in evaluating plaintiff's credibility, he is not required to make a "formalistic factor-by-factor recitation of the evidence." Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).

In his decision, the ALJ devotes several pages to summarizing plaintiff's complaints and alleged symptoms, and he thoroughly discusses his credibility finding as it relates to this evidence. (R. 22-32). Furthermore, the ALJ explains the specific factors leading to his determination, including plaintiff's inconsistent testimony, the contrary medical evidence, the efficacy of treatment and medication, the lack of neurological damage, the normal radiology studies of spine, plaintiff's daily activities, and plaintiff's employment during the relevant time.

(R. 29-33). Specifically, there existed discrepancies in regard to plaintiff's work history, her education history, her ability to care for her son, and her alleged pain as compared to the normal results revealed by the physical examination tests. (R. 31-32). Plaintiff's reported activities were not indicative of her complaints of totally disabling pain because she was able to perform chores, maintain a household, and take care of her son. (R. 33). The ALJ recognized that some chores required more time than before, and that plaintiff was unable perform strenuous activity. Id. The ALJ found plaintiff's activities were inconsistent with her alleged complaints and he adequately explained why he made this finding. Id.

Also, the ALJ did not err in his interpretation of Dr. Craig's consultative examination, stating that plaintiff's "cognitive abilities, focus and concentration appeared normal." (Dkt. # 17 at 8). In the Mental Status Report, Dr. Craig states that plaintiff's "cognitive abilities, focus and concentration appeared normal," but in the Summary portion, she concludes that plaintiff's "ability to work is moderately impaired with respect to understanding complex instructions, remembering instructions, sustaining focus and concentration, *or* socially interacting with coworkers or public." (R. 371, 373) (emphasis added). Although an ambiguity exists in the consultative examination report, contrary to plaintiff's argument, the ALJ was not "flatly incorrect" or "erroneously miscasting the evidence." (Dkt. # 17 at 8). The existence of an ambiguity in the evidence is resolved by 20 C.F.R. § 404.1520(b), which provides:

> When there is an ambiguity in the evidence it will be deemed inconsistent and we will weigh the relevant evidence and see whether we can determine whether you are disabled based on the evidence we have.

As discussed above, the ALJ was thorough in weighing and explaining his reasoning in support of his decision. Supra at 13; (R. 32).

Similarly, the ALJ did not fail to discuss Dr. Craig's finding of moderate impairment in plaintiff's ability to socially interact with coworkers. (Dkt. # 17 at 9). As explained previously, there is sufficient evidence to conclude that the ALJ adequately considered plaintiff's impairment in regard to her ability to socially interact with coworkers. Supra at 11: (R. 28).

Plaintiff next argues that the credibility determination is faulty because the ALJ relied on invalid discrepancies including the discrepancy between plaintiff's statement that she left the house once every two weeks and that she took her son to school every day; the discrepancy between plaintiff's work history; and the discrepancy of time between hallucinations. (Dkt. # 17 at 12). Plaintiff denies having stated that she left the house only once every two weeks and states that she is actually quite open regarding the frequency she leaves the house. Id. Although Dr. Craig's consultative examination report states that plaintiff "gets up about 6:00 a.m., does housecleaning, cooking, and takes son to and from school," it also states that plaintiff only "gets out of the house approximately once every two weeks." (R. 373).

Plaintiff also complains that the ALJ's use of the discrepancy regarding her statements "that she had not been working since 1995" and that she had not "been unemployed except for two months since her incarceration ending in 1998" is inappropriate because of plaintiff's medically supported memory problems. (Dkt. # 17 at 12, citing to R. 373). Plaintiff asserts that the ALJ used the internal discrepancy in Dr. Craig's report regarding plaintiff's reporting of hallucinations for five years, and then fifteen years, against her, rather than properly resolving the discrepancy. (Dkt. # 17 at 9, citing to R. 371, 373). Citing to 20 C.F.R. § 404.1520(b), plaintiff asserts that these discrepancies are typographical errors that the ALJ must resolve by contacting the doctor. (Dkt. # 17 at 9).

But 20 C.F.R. § 404.1520(b) does not say what plaintiff says it does. Again, when there is an internal conflict in the evidence it will be deemed inconsistent, and "we will weigh the relevant evidence and see whether we can determine whether you are disabled based on the evidence we have." 20 C.F.R. § 404.1520(b). Plaintiff incorrectly asserts that the consultative examination reports should be free of internal inconsistencies and that any internal inconsistencies should be detected by the ALJ. (Dkt. # 17 at 9, referring to 20 C.F.R. § 404.1519p(a)(2)). Plaintiff is only partially correct. Internal inconsistencies are to be considered when reviewing consultative examination reports, but the ALJ is not required to resolve them. 20 C.F.R. § 404.1519p(a)(2). More importantly here, even if the inconsistencies were resolved in plaintiff's favor, the ALJ's conclusion regarding plaintiff's credibility remains supported. (R. 30-32).

Plaintiff next alleges that the ALJ miscast the evidence by not recognizing plaintiff's current medications at the time of the hearing and by not paying adequate attention to plaintiff's persistent side effects in determining her credibility. (Dkt. # 17 at 10). Plaintiff asserts that the ALJ incorrectly concluded that plaintiff was not sick during her treatment, that she was too active, and that she was not credible because she responded rapidly to the hepatitis treatment. Id.

However, plaintiff's contention that the ALJ failed to consider the medications and side effects when making his credibility determination is unsupported. Factors that will be taken into consideration as relevant to a plaintiff's symptoms are the type, dosage, effectiveness, and side effects of any medication. 20 C.F.R. § 404.1529(c)(3)(iv). The ALJ recognized that plaintiff experienced nausea, fatigue, malaise, anemia from hepatitis treatment, and diarrhea which ended when her treatment was completed in March 2008. (R. 25). The ALJ also considered plaintiff's testimony and documented her side effects from pain management, including an inability to

focus, forgetfulness, constipation, loss of memory, and problems with numbers, fatigue and tiredness. (R. 29). The ALJ further noted that the interferon treatments made her feel insane, suicidal, and caused her to stay in bed one or two days after the treatments. Id.

The ALJ did not specifically address each fact in the record, but this failure does not support a conclusion that he failed to consider the evidence, and therefore, that he made an incorrect credibility determination. (Dkt. # 17 at 11-15). Plaintiff asserts that since the ALJ did not specifically note that plaintiff's transient ischemic attacks were due to a hole in plaintiff's heart requiring surgery, the ALJ's credibility determination is incorrect. (Dkt. # 17 at 11). Plaintiff also asserts that since the ALJ failed to mention plaintiff's complaints of dizziness, palpitations, and strokes, he must have failed to consider these complaints altogether. Id. Plaintiff argues that the ALJ cannot discount plaintiff's credibility based on the finding that the x-rays of the lumbar spine were normal and based on the fact that plaintiff's surgeries were successful. Id. Though plaintiff did not testify as to her condition of rheumatoid arthritis, plaintiff claims that the ALJ did not give adequate consideration to plaintiff's elevated erythrocyte sedimentation rate that is documented in the laboratory reports. Id.

The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996). The ALJ's decision reflects his consideration of all the evidence. (R. 23-33). The ALJ recognized the imaging consistent with degeneration at C5-6 and T11-12 and plaintiff's rating of 10 for pain on a "1 to 10" pain scale. (R. 24). He also recognized that plaintiff underwent ESI and he noted the medical testing for an inflammatory/immune disorder, which indicated a negative screen for ANA and RA. (R. 24, 434).

Plaintiff also asserts that the ALJ failed to discuss plaintiff's history of mental turmoil leading to suicidal attempts and hospitalization and that Dr. Craig's consultative examination documentation of this history was ignored by Dr. Gordon. (Dkt. # 17 at 15). Plaintiff is incorrect. The ALJ mentions twice in his decision his consideration of plaintiff's history of suicidal attempts and mental turmoil, characterized by depression and anxiety. (R. 24-25).

Plaintiff next asserts that the ALJ erred because he misquoted plaintiff. (Dkt. # 17 at 11). The ALJ noted that plaintiff said "her pain was a 10" and that the pain felt like "putting her hand in the fire." (R. 31). Though plaintiff did assert her pain was a 10 on a scale of 1 to 10, she never made the statement that her pain was like "putting her hand in the fire." Id. Thus, the ALJ misquoted plaintiff, but this misquote was harmless. Where the correct quotation would not have changed the ALJ's conclusion, the court will find that the misquote was harmless. Jaques v. Astrue, 2:12-CV-215-BCW, 2013 WL 603879 (D. Utah Feb. 19, 2013). In Jaques, the ALJ misquoted a physician's findings. Id. The court reasoned that if the ALJ had not made this error, a different conclusion would have been reached. Id. Therefore, the error was not harmless. Id. In this case, however, the ALJ's misquote is consistent with plaintiff's perception of the intensity, ranking the pain as most severe on a scale rating. (R. 31).

Finally, plaintiff believes that the ALJ should not have found her to lack credibility because the record contains no evidence suggesting that plaintiff had exaggerated her complaints, and also because she has a good past work history and had attempted to return to work. (Dkt. # 17 at 12, 15). However, plaintiff provides no legal basis for these arguments. The cases cited by plaintiff note only that the absence of exaggeration is favorable to plaintiff's

credibility.[1] <u>Alexander v. Barnhart</u>, 74 Fed. Appx. 23, 28 (1-th Cir. 2003); <u>Smith v. Barnhart</u>, 61 Fed. Appx. 647, 650-651 (10th Cir. 2003). Furthermore, the point is moot because there is substantially evidence in the record to support the ALJ's conclusion that plaintiff exaggerated her complaints. By way of example, Dr. Gordon's consultative examination states that plaintiff's "expressions do not seem to be sincere." (R. 616).

The Court therefore finds that the ALJ's credibility determination is supported by substantial evidence and is the result of the correct application of the applicable legal standards.

## CONCLUSION

Based on the foregoing, the Court AFFIRMS the decision of the Commissioner denying disability benefits to plaintiff.

SO ORDERED this 27th day of September, 2013.

T. Lane Wilson
United States Magistrate Judge

---

[1] Similarly, plaintiff cites to two cases noting that a good past work history speaks highly of plaintiff's motivation and that an attempt to return to work is a positive credibility factor, but these cases do not establish a requirement that the ALJ must make a positive credibility determination on this basis. <u>See</u> <u>Tyson v. Apfel</u>, 107 F.supp.2d 1267, 1270-1271 (D.Colo. 2000); <u>Jackson v. Sullivan</u>, 1993 WL 128696 at *5 (10th Cir. 1993).